Kyra E. Andrassy, Esq.
Admitted *Pro Hac Vice*
SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone: (714) 445-1000
Facsimile: (714) 445-1002
kandrassy@swelawfirm.com

Maria A. Gall, Esq.
Nevada Bar No. 14200
BALLARD SPAHR LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135
Telephone: (702) 471-7000
Facsimile: (702) 471-7070
gallm@ballardspahr.com

*Attorneys for Receiver*
*Geoff Winkler of American Fiduciary Services*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PROFIT CONNECT WEALTH SERVICES, INC., JOY I. KOVAR, and BRENT CARSON KOVAR,<br><br>Defendants. | Case No. 2:21-cv-01298-JAD-BNW<br><br>APPLICATION FOR ALLOWANCE AND PAYMENT OF FEES AND COSTS OF THE RECEIVER AND HIS PROFESSIONALS FOR THE PERIOD FROM OCTOBER 1, 2021, THROUGH DECEMBER 31, 2021<br><br>[HEARING REQUESTED][1] |

Geoff Winkler of American Fiduciary Services, LLC, the permanent receiver (the "Receiver") over Profit Connect Wealth Services, Inc., and any subsidiaries and affiliates (together, "Profit Connect") pursuant to an order entered on August 6, 2021 (the "Receiver Order"), submits this application for allowance and payment of his fees

---

[1] The Receiver requests that the Court schedule a hearing on this application at the same date and time as the hearing on the Receiver's status report, which is being filed on or about November 1, 2021.

2898670.2

and costs and the fees and costs of the professionals he employed to assist him in fulfilling his duties under the Receiver Order. The period of time covered by this Application is from October 1, 2021, through December 31, 2021 (the "Application Period"). The Receiver is informed that the Securities & Exchange Commission ("SEC") has no objection to the relief sought in this Application.

## MEMORANDUM OF POINTS AND AUTHORITIES

Because the Receiver is not a licensed attorney, does not have in-house counsel, and is not a computer expert, he employed professionals to assist him in fulfilling his duties as the Receiver. Specifically, pursuant to Section X.G. of the Receiver Order, he retained Smiley Wang-Ekvall, LLP, and Ballard Spahr, LLP, as counsel and Stroz Friedberg as his computer forensic experts. The Court approved their employment by order entered on September 21, 2021. Pursuant to this Application, the Receiver and his professionals seek approval of the following fees and costs: (1) $284,348.00 in fees and $12,085.57 in costs for the Receiver; (2) $60,977.72 in fees and $2,966.83 in costs for Ballard Spahr, LLP; (3) $17,967.30 in fees and $941.41 in costs for Smiley Wang-Ekvall, LLP; and (4) $10,758.75 in fees and $15,064.69 in costs for Stroz Friedberg. The Receiver seeks authority to pay 80% of the fees on an interim basis and 100% of the costs.

This Application is based on the below written argument, the declarations of Geoff Winkler, Maria A. Gall, Esq., Kyra E. Andrassy, Esq., and Sergio Kopelev, all papers on file, and any argument the Court may call and consider.

I.     **RELEVANT BACKGROUND AND PROCEDURAL HISTORY**

The SEC initiated this action against Profit Connect, Joy Kovar, and Brent Kovar on July 8, 2021, by the sealed, ex parte filing of a complaint and motion for temporary restraining order seeking, among other things, the freezing of defendants' assets and the appointment of a receiver over Profit Connect. The Court granted the ex parte temporary restraining order, in part, by allowing the asset freeze to proceed

2898670.2      2

but set the motion for a hearing in order to provide defendants an opportunity to be heard on the temporary receivership request.

On July 23, 2021, defendants stipulated to modify the temporary restraining order to appoint the Temporary Receiver. By order entered on August 6, 2021, the Court approved a stipulation of the parties appointing the Receiver as the permanent receiver.

During this Application Period, the Receiver's focus was on the auction of personal property assets that was conducted in December, generating net proceeds of approximately $1,259,817 for the receivership estate. The Receiver continues to identify potential claims that belong to the receivership estate and to gather information, issue subpoenas, and review books and records and documents that are produced to identify additional sources of recovery. These efforts will pave the way for additional recoveries to be obtained by the estate. Counsel continue to coordinate their efforts to avoid duplication of services.

As of December 31, 2021, the Receiver is holding $7,844,306.86, which does not include the net proceeds generated from the auction of personal property that was received after December 31. As set forth in the motion to approve the employment of the professionals and because receivership work is a form of public service, each of the professionals has agreed to discount their typical hourly rate by 15%, and this discount is reflected in the fees being sought in this Application.

## II.  LEGAL AUTHORITY

"The power of a district court to impose a receivership ... derives from the inherent power of a court of equity to fashion effective relief."[2]  "The primary purpose of equity receiverships is to promote orderly and efficient administration of the Receivership Estate by the district court for the benefit of creditors."[3]  "[T]he practice

---

[2] *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980).

[3] *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986.)

in administering an estate by a receiver … must accord with the historical practice in federal courts or with a local rule."[4]

As the Ninth Circuit explained:

> A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. The district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership. The basis for this broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions.[5]

Decisions regarding the timing and amount of an award of fees and expenses to the Receiver and his or her professionals are committed to the sound discretion of the Court.[6] In determining the reasonableness of fees and expenses requested in this context, the Court should consider the time records presented, the quality of the work performed, the complexity of the problems faced, and the benefit of the services rendered to the Estate, along with the Commission's position on the request, which is entitled to "great weight."[7]

### III. THE FEES AND COSTS BEING REQUESTED

As set forth in prior applications, in evaluating the fees and costs of the Receiver and his professionals, the fact that Profit Connect had no books and records, including books of account, or any functioning accounting department must be taken into account. The absence of these records means that the Receiver and his team

---

[4] Fed. R. Civ. P. 66.

[5] *SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (citations omitted); *see also CFTC v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the court's supervisory role, and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose of orderly and efficient administration of the receivership for the benefit of creditors.").

[6] *See SEC v. Elliot*, 953 F.2d 1560, 1577 (11th Cir. 1992) (rev'd in part on other grounds, 998 F.2d 922 (11th Cir. 1993)).

[7] *SEC v. Fifth Ave. Coach Lines, Inc.*, 364 F. Supp. 1220, 1222 (S.D.N.Y. 1973).

must get the documents that they need to determine what happened with funds put in by investors from third parties. This requires the issuance of subpoenas, and often ensuing discussions with the subpoenaed parties about the scope or timing of the requested production. It also means that the Receiver has had to recreate, and is still in the process of recreating, accounting records by reconstructing the entity's financials using financial statements and offsetting financial records. The majority of these statements and records have had to be procured through subpoenas served on financial institutions.

Also, despite the Receivership Order and the principles underlying a federal equity receivership, some investors are seeking other methods of recovery to recoup their investments ahead of other investors. The Receiver is presently aware of a putative class action that is being formed by one set of investors and counsel. The Receiver is also aware of at least one action by an investor against a Profit Connect agent pending in another jurisdiction. The Receiver and his counsel are engaging with counsel in these anticipated and pending lawsuits in order to preserve the assets of the receivership estate.

The foregoing highlights some of the actions the Receiver and his legal professionals have been constrained to undertake early in this case and which drives their fees. That said, the Receiver's prompt action in reconstructing Profit Connect's financial records has assisted in his preservation and marshalling of Profit Connect property, including over $4 million dollars in cryptocurrency and a recovery of $___ for the personal property assets.

Below is a description of the services provided by each of the professionals during the Application Period. All of the fees and expenses incurred during the Application Period will benefit the receivership estate moving forward.

### a. The Receiver

[Fees of $284,348.00 and costs of $12,085.57]

Pursuant to paragraph X of the Receiver Order, the Receiver was empowered and tasked with a broad range of authority, including the authority to take possession and control of all assets, to assume full control of Profit Connect, to have control of and be added as the sole authorized signatory for all accounts, to conduct an investigation and discovery necessary to locate and account for assets, to assess the viability and profitability of Profit Connect, to take action necessary to preserve and prevent the disposition, concealment, or dissipation of assets, to employ professionals, to make an accounting, to make payments and disbursements, to investigate and prosecute claims, to engage in litigation to preserve or recover assets or to carry out the Receiver's mandate, and to have access to all mail and electronic mail.

Pursuant to the Receiver Order, the Receiver and his team performed the following duties:

- took possession of and liquidated cryptocurrency at a significant profit to the estate;
- subpoenaed records and performed forensic accounting to recreate missing accounting information and validate amounts owed to investors and others;
- prepared for the sale of real properties in North Las Vegas and Searchlight, Nevada;
- worked with the auctioneer, former employees, and temporary workers to prepare for the auction of personal property at the Speedway location, which netted the estate almost $300,000 more than the auctioneer's top estimate;
- managed all utilities to ensure needed services through the auction and cancellation once they were no longer needed;
- worked with auctioneer and team to quickly prepare and turn over the warehouse to the landlord to save the estate funds;

- closed payroll accounts and made sure all payroll taxes were properly paid and that all tax documents were prepared for employees;
- cancelled all business insurance after the auction to ensure coverage while needed and to obtain a refund of unused premiums;
- investigated additional assets and worked to determine if they were properly assets of the receivership estate;
- discussed and worked with counsel to pursue litigation against third parties;
- reviewed and proposed tax accountants to prepare unfiled tax returns; and
- continued to review documents and interview parties to determine potential litigation against third parties.

The Receiver's fees for the Application Period are as follows:

| Name | Title | Hours | Rate/Hr. | Total |
|---|---|---|---|---|
| Geoff Winkler | Receiver | 226.3 | $340.00 | 76,942.00 |
| John Hall | Accountant | 228.1 | $310.00 | 70,711.00 |
| Miliana Barkhancy | Director | 55.3 | $255.00 | 14,101.50 |
| Renee Dieffenderfer | Associate | 143.2 | $255.00 | 36,516.00 |
| Josh McGraw | Associate | 275.5 | $255.00 | 70,252.50 |
| Ysabel Willits | Analyst | 105.5 | $150.00 | 15,825.00 |
| Total | | 1033.90 | | 284,348.00 |

Due to its broad range of experience and expertise, AFS performs almost all required work in-house, saving both time and money, including tasks involving corporate accounting, forensic accounting, case administration, claims administration, asset valuation, investor communication and internet technology. AFS' billing philosophy is to leverage work down to the staff member with the lowest

2898670.2

7

bill rate that also has the skills and experience necessary to complete the task. This allows AFS to minimize the cost to complete all work associated with the case, ensuring a maximum return to stakeholders involved in the matter while also preserving the quality of our work product. AFS does not bill for travel time in regulatory cases.

AFS's rates include a 15 percent discount off its already discounted hourly rates for government matters and will not increase for the pendency of the case. Both the standard regulatory rate and the discounted regulatory rate reflect a significant discount off our standard consulting rates.

All billing standards meet or exceed the SEC's Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission (SFAR) and the U.S. Trustee's Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses.

The Receiver anticipates a significant drop in the number of hours required to manage this case with the sale of the personal property, closure of the business, and the turn-over of the warehouse location to the landlord as many of the hours spent this period were dedicated to tasks.

The Receiver's expenses for the Application Period are as follows:

| Category | Total Cost |
| --- | --- |
| Airfare | $5,004.37 |
| Courier/Shipping/Freight | $497.58 |
| Meals | $1,006.50 |
| Hotel | $4,192.89 |
| Technology | $13.00 |
| Miscellaneous | $55.47 |
| Parking | $189.50 |

| Taxi | $607.76 |
|---|---|
| *Total* | *$12,085.57* |

AFS will not seek reimbursement for routine copying, facsimile, postage, or other expenses. Any expenses which AFS seeks to have reimbursed will be done so in accordance with the SEC and U.S. Trustee guidelines above. Costs directly attributable to the administration of the estate will be paid directly by the estate in accordance with the order of appointment.

The Receiver also anticipates a significant drop in the expenses required to manage this case dues to the sale of the personal property, closure of the business, and the turn-over of the warehouse location to the landlord as less travel will be necessary.

The Standardized Fund Accounting Report, AFS's invoice, and its billing entries are included with the Declaration of Geoff Winkler attached as Exhibit 1.

### b. Ballard Spahr

[Fees of $60,977.72, and costs of $2,966.83]

During the Application Period, attorneys at Ballard Spahr LLP performed services on multiple projects. Their work included, among other things: (1) issuing and enforcing subpoenas to various entities in an effort to track, trace, and recover Profit Connect assets; (2) liaising, negotiating, and settling with third parties to ensure Profit Connect assets in their possession were properly transferred to the Receiver's control and ready for the personal property auction held in December 2021; (3) investigating, analyzing, and drafting necessary documents to ensure Profit Connect property was properly preserved for transfer to the Receiver; (4) advising the Receiver on his obligations in connection with preserving Profit Connect assets; (5) initiating the action against former Profit Connect employee William Roshak, et al. to recover over $500,000 in fraudulently transferred Profit Connect funds, including the work associated with drafting and filing the complaint, negotiating extensions of

answers, and preliminary conversations regarding settlement with opposing counsel; (6) liaising and negotiating with counsel for investors on their putative class actions and other litigation to recoup monies outside the receivership, as well as filing injunction motions to stay their proceedings in violation of the receivership order; and (7) advising the Receiver on his obligations in relation to a subpoena received by the receivership estate.

During the Application Period, the Receiver's primary counsel from Ballard Spahr, Maria Gall, billed 110.1 hours at a standard rate of $495.00/hour for a total of $54,499.50. Where appropriate, she leveraged work to a third-year associate, Andrew Clark, who billed 39.8 hours at a standard rate of $315.00/hour for a total of $12,537.00, as well as paralegal Christine Snider who billed 0.6 hours at a standard rate of $280.00/hour for a total of $168.00 and paralegal Adam Crawford who billed 0.9 hours at a standard rate of $160.00/hour for a total of $144.00. Ms. Gall will continue to leverage work where appropriate but notes that much of the work being performed is not only appropriate for a junior partner but also requires wide-ranging knowledge of the receivership and, for that reason, is more efficiently performed by her. Also where appropriate, Ms. Gall has sought the assistance of counsel with specialized knowledge. Senior partner Margie Peerce 1.2 hours at $925.00/hour for a total of $1,111.00 to advise on a confidential matter involving subpoenas, which is in Ms. Peerce's area of expertise. Finally, of counsel Diane Markert billed 8 hours at $410.00/hour for a total of $3,280.00 to advise on real estate matters, which is in Ms. Markert's area of expertise. Ballard Spahr has discounted all these standard fees by 15%, and seeks $60,977.72 in discounted fees and $2,966.83 in costs for its professional services in Q4 2021.

Ballard Spahr's invoices are included with the Declaration of Maria Gall attached as Exhibit 2.

### c. Smiley Wang-Ekvall

[Fees of $17,967.30 and costs of $941.41]

During the Application Period, Smiley Wang-Ekvall performed a number of different services that benefited the estate, including: (1) filing the motion to employ an auctioneer to sell personal property of the receivership estate; (2) revising listing agreements with a real estate broker regarding the real property; (3) preparing a stipulation regarding the procedure for selling the residential real property owned by Profit Connect; (4) beginning preparation of a motion to retain a broker to list and sell the real property; (5) preparing and obtaining Court approval of a stipulation to clarify that Profit Connect, a Nevada corporation, was a receivership entity; (6) communicating with the Kovars regarding the deadline for them to vacate their residence; (7) preparing documentation to compensate the estate for a loan that Profit Connect made to an employee to purchase a home; (8) analyzing the issue of who has standing to bring various claims against third parties; and (9) issuing subpoenas and then meeting and conferring with the recipients regarding both timing and the scope of the requested productions.

The Receiver's primary counsel from Smiley Wang-Ekvall billed $17,832.15 in fees and Janet Hogan, a paralegal, billed $135.15 in fees. These fees reflect a 15% discount off of the standard hourly rates.

Smiley Wang-Ekvall's invoices are included with the Declaration of Kyra Andrassy attached as Exhibit 3.

### d. Stroz Friedberg

[Fees of $10,758.75 and costs of $15,064.69]

During the Application Period, staff from Stroz Friedberg (an Aon company) continued to assist the receiver with understanding, quantifying and collecting data from various Profit Connect IT systems, although the amount of work required has significantly decreased as the Receiver expected it would. This work included, among other things: (1) continuing to inventory digital devices used by Profit Connect principals and employees; (2) continuing to gain access to and export financial data for Profit Connect; (3) continuing to perform forensic collection of data from various

digital devices; (4) continuing to export data from various digital devices; (5) continuing to process and host data exported from various digital devices; and (6) continuing to perform searches of hosted data. Stroz Friedberg billed $10,758.75 on an hourly basis and $15,064.69 in expenses for processing and hosting and for user licenses of data collected from Profit Connect in the Relativity Electronic Discovery application. These rates and accompanying invoices already include discounts from Stroz Friedberg standard rates.

Stroz Friedberg's invoices are attached to the Declaration of Sergio Kopelev attached as Exhibit 4.

## IV. CONCLUSION

Based on the foregoing and pursuant to Section X.G. of the Receiver Order, the Receiver and his professionals request entry of an order:[8]

(1) Allowing the Receiver $284,348.00 in fees and $12,085.57 in costs for the Application Period;

(2) Allowing Ballard Spahr $60,977.72 in fees and $2,966.83 in costs for the Application Period;

(3) Allowing Smiley Wang-Ekvall, LLP $17,967.30 in fees and $941.41 in costs for the Application Period;

(4) Allowing Stroz Friedberg $10,758.75 in fees and $15,064.69 in costs for the Application Period;

(5) Authorizing the Receiver to pay 80% of the allowed fees and 100% of the allowed costs from funds on hand in the receivership estate; and

(6) Granting such other and further relief as the Court deems just and

---

[8] The form of the order is attached as Exhibit 5.

appropriate.

Dated: February 7, 2022

                                                         SMILEY WANG-EKVALL, LLP

By: /s/ Kyra E. Andrassy
     Kyra E. Andrassy, Esq.
     (Admitted *Pro Hac Vice*)
     3200 Park Center Drive, Suite 250
     Costa Mesa, California 92626

-and-

Maria A. Gall, Esq.
Nevada Bar No. 14200
BALLARD SPAHR LLP
1980 Festival Plaza Drive, Suite 900
Las Vegas, Nevada 89135

*Attorneys for Receiver*